Thank you, Your Honor. And may it please the Court, I want to get right to the order that this Court issued on November 20. And the answer to the question posed in that order is that there is no conflict between state law and Section 30A of the Medicaid Act. Plaintiffs have not identified a state law that conflicts with Section 30A of the Medicaid Act, and that is because there is none. Plaintiffs claim, which is essentially agency in action, in the sense that the Department did not raise rates under 30A, violates Orthopedic Hospital. But unlike the case Orthopedic Hospital, there is no statute, where of course there was. Well, I guess one of the things that occurred to me, Mr. Withrow, is how is it that the Idaho Department has the authority to do anything? There must be some kind of an enabling statute or regulation, is there not? Sure, there is an enabling statute within the portion of the Idaho Code dealing with the powers and the duties of the Director of the Department of Health and Welfare, which of course is the Medicaid agency. And from there, one of the provisions is that the Department has the authority to enter into cooperative agreements with the federal government to administer, among other things, the Medicaid program in Idaho. And from there, the rates are set. Of course, the Department takes its cues from Section 30A and other applicable statutes. But it is done by administrative process involving actuarials, program folks, financial folks, and in many cases the providers or their representatives themselves to arrive at this sort of collaborative rate-setting process that is then established in a thing called a pricing file and then published on the Department's website. Is it your position, counsel, that state inaction is not a thing in the Constitution or laws with which the federal law can conflict? Precisely, Your Honor. Take a look at the Idaho case before the Supreme Court and the airbag case, Greiner. In that situation, the common law of the District of Columbia positively required airbags because otherwise the cars would be a product that was defective. The government, the federal government, had a variety of different passive restraint requirements. They didn't require airbags. There was inaction by the federal government in requiring airbags. Yet the Supreme Court said that there was a conflict between the requirement by the District of Columbia and the inaction in failing to require airbags by the federal government. Why isn't that inaction analogy similar to this? I'll confess unfamiliarity with that particular case because in my research once the order came out, I found one example of a case specific to the Medicaid context where agency action of the kind here was deemed to be inaction that didn't have the requisite component of a thing in the state laws or rules. And what case was that? That case, Your Honor, is from the Fifth Circuit in 2009. Hawkins, right? Yes, equal access for El Paso. What is the basis upon which the esteemed Fifth Circuit Court of Appeal reasoned that inaction was not a thing in the Constitution or law? Well, and what they said, what the circuit said in that case was that there, that the plaintiffs had failed to identify a statute or regulation. There's no question that the plaintiff has not failed to identify. They're identifying a budget of the state of Idaho which does not appropriate funds for the rate rise. And that's. Identify it. Yes, they have claimed that the rates don't meet Section 30A and those rates. They've identified the Budget Act which says there is no money for this rate rise. So they've identified something. Except that the budget doesn't get down to that level of granularity with respect to rates. And let me explain how that works. So when the department presents its budget to the legislative committee, it does so on several levels. But the appropriations bill, for example, lists I think four or so items of funds that fund various things. One of which is the one that applies here is the so-called enhanced plan benefits. That's a line item in the budget. And within that, the legislature identifies a couple of funds that are appropriated sort of in a block sense. In other words, from these two funds, Department of Health and Welfare, you spend how you want on these programs. It doesn't get to the granular level of what rates will be. And so the legislature does not budget for specific rates. This is not a situation where the department says, please give us X amount of money so we can fund this service at this amount and this service at this amount. And then the legislature appropriates a percentage of that on a service-by-service basis. So as I understand it, then the failure to fund the rates is essentially a determination within the IDHW that we're just not going to use more of the money from that fund that we otherwise could use, because to do so is going to take money away from other programs that we need to fund. Sure. Once the department gets that pot of money, it goes back and says, okay, well, this is the pot of money we have, we have to provide these certain services, because we've agreed with Medicaid that we will provide X number of services. So in other words, if we give it to this class of Medicaid beneficiaries, we're going to have less to give a different class of Medicaid beneficiaries. Precisely, Your Honor. And if they adopted a regulation, I imagine the Department of Health and Welfare can adopt regulations? The Department of Health and Welfare can adopt regulations. If they adopted a regulation saying we're not going to raise the rates, no matter what the costs are, no matter what the ‑‑ no matter anything, that regulation would be, by analogy, a thing in the Constitution or laws, would it not? I would agree that a regulation could be a thing in the ‑‑ yeah. Yeah, a thing. So why, if it can be done by regulation as it was in the Locke case, which is the Seattle case where regulations were found to be in conflict with federal regulations, why is it any different if they, without adopting a regulation, simply do not act? I think then it's ‑‑ the challenge is then one that the department has affirmatively violated the law. And, of course, preemption has a different test than whether a state official has violated the law. So you're saying the difference is there can be a conflict between federal and state rules if there's affirmative action by the state, but not if there's passive or inaction. I guess I would, yeah, I guess I would clarify. And your authority for that is Hawkins? Is Hawkins, yes. Has Hawkins been cited anywhere else? Followed anywhere else? It's been cited for the same principle in an unpublished district court decision from the Western District of Texas, which I do not have. Which is in the Fifth Circuit, right? Correct, which is in the Fifth Circuit. Isn't Hawkins a little stronger than that? I mean, I read that to mean that you can't have an individual actor making decisions or not making decisions constitute state law. Much like an individual actor in a police brutality case wouldn't necessarily be carrying out the law or policy of a municipality. An individual state actor, his action, her action doesn't necessarily constitute state law. True? I think that's correct, Judge Murphy. And so I think that that's where the preemption doctrine kind of at some point cuts off things that can be preempted and things that can't be. And I think that the dividing line is a state law or regulation. Well, as I understand it, and I will obviously pursue this with plaintiff's counsel, as I understand it, the problem here is 30A basically doesn't say anything at all about rates. All it says is that you have to construct the program in such a way so that you offer the same types of services to Medicaid recipients that are otherwise available, and you have to consider efficiency and economy and so on in delivering those services. And as I understand the record, there's no evidence yet that any Medicaid beneficiary has been turned away by any of these providers because of the fact that the state won't increase the rates. That's precisely correct, Your Honor. And, in fact, among several reasons why we believe the district court's judgment misapplied orthopedic hospital, the court in its decision actually acknowledged that Section 30A's goals were probably likely met, I think the word probably appeared in the decision. There were no findings that economy, efficiency, access, or quality were lacking. And, in fact, there were stipulated findings that the plaintiffs had capacity, or at least one of the plaintiffs had access capacity, and that they had not ever turned away a prospective client because they couldn't serve that client due to cost. And there's another interesting finding that does not exist, or allegation that does not exist in this case, which I think bears on the purpose of Section 30A, which is to establish methods and procedures which are intended to produce a result, which is access. There are no findings or an allegation that rates were affecting these providers' ability to care for clients, making their claim even less individualized than the general claim that they have, gosh, these rates aren't high enough, but they have not at any point tied an allegation or a fact to them personally that's being affected by these rates, which they claim are too low. And I take it what's happened is that the district court has essentially entered an affirmative injunction, which directs Ms. Clement or her successor as the head of that unit to pay the higher rates on pain of contempt. And she has taken that judgment and gone back to the legislature and said, look, I don't have a choice, I'm now under a federal court order to pay these higher rates, and eventually the legislature sort of caved in and appropriated more money. My understanding is that the Department of Health and Welfare did seek what they call in Idaho a supplemental appropriation after this came down. When this judgment came down, I think it was roughly April, the legislature had long made it home for the year. Does the legislature sit every other year or once a year? They sit every year. They start early January, and depending on what's going on that year, they're usually gone by the end of March. Well, let's say they've raised the money and raised the rates. Why is this case moot? It's not moot because we are under an ongoing injunction to continue to pay these rates, despite the fact that these rates don't have, frankly, any bearing, based on the facts, don't have any bearing on whether the purpose and the goals of Section 30A are met. Well, your position is that the injunction itself is void because the plaintiffs basically are not empowered. I don't know if it's a standing question or there is no cause of action for a violation of the supremacy clause on which the district court has issued this injunction. Precisely. Our second argument is that orthopedic hospital should not apply because of managed pharmacy care or because it placed in the statute things that shouldn't be there. But our leading argument is that the plaintiffs do not have a right of action under Section 30A to enforce the terms of Section – I'm sorry, right of action under the supremacy clause to enforce the terms of Section 30A against the state. Tell me again, if we go to the second issue, why orthopedic hospital doesn't bind us. I don't think orthopedic hospital still binds because I think that this – ties right into what was going on in managed pharmacy care. And recall in managed pharmacy care, there were California state statutorily mandated rate cuts that the Secretary of CMS had approved and this court in managed pharmacy care said, well, now we have an authoritative construction about what 30A requires, which we didn't have in orthopedic hospital. And then under the Chevron and other deference standards, the court deferred to that decision. But, I mean, inherent in that decision is a recognition that there is a cause of action under the supremacy clause, which is, I understand, the Supreme Court – at least four justices of the Supreme Court question. And that's true as to the lawsuit against the Secretary. The lawsuit against the Secretary was regarding variety APA action standards. But in managed pharmacy care, the court said, look, we don't – because we've upheld the rate cuts in – that the Secretary has approved, we don't have to get to the question as to whether the suit by the providers against the state may proceed under the supremacy clause. And in light of Douglas, the dissent, some of the hints in the majority opinion, and then Planned Parenthood against Indiana, we think that the days of a supremacy clause right of action to enforce this statute should be about over. I'd like to reserve the minute remaining time that I have to rebuttal. I'll give you some time. Okay. Thank you, Your Honor. Thank you. Is that Mr. Piotrowski? It is, Your Honor. All right. Welcome to the night, sir. Thank you. And may it please the court, we get accustomed to traveling when we're handling appellate argument, and we're from Idaho, but we'd love to welcome the justices to our home state any time. We enjoy sitting over there, and I do so frequently. Excellent. All right. This court should take the opportunity presented by this case to squarely address what 42 U.S.C. 1396A30A requires in the absence of federal regulatory guidance, because that's the issue squarely presented to Judge Windmill in the district court, and the issue remaining even after we look at the other intervening decisions in this case. Why wouldn't that be an advisory opinion? I mean, the only issue before us is, is there a conflict here that the supremacy clause addresses? And can you start where your opponent started and answer the question that we sent out in our order? Absolutely, Your Honor. The fact is that Mr. Withrow did not handle his case in the district court. The lawyers who did and the judge who did were all quite familiar with Idaho's Medicaid program, and so some shorthand was certainly undertaken by all involved. This was the third case that Judge Windmill heard on this topic, and he was the only judge who could hear the case. And so we knew it would end up with him. Well, that's because Judge Lodge's wife is a state senator, right? And on the health and welfare committee. Oh, okay, well. So not merely is she a state senator, but she was involved in some of the decisions that brought us here. All right, but let me cut you to the quick. Absolutely. I mean, as I understand your claim, you are claiming that Director Armstrong's refusal is the basis of the conflict here. Is that right? Yes, Your Honor. But refusal to do what? It's not merely the refusal. It was shorthanded as a refusal, but what it actually is is the establishment of a system. The Idaho statutory system provides great discretion to the director. But the system has been approved by the Center for Medicaid Services. The system we want has been approved by CMS. What the director has actually been doing is not approved by CMS, and that's why this is not managed care. But the director raised the rates, but then the legislature said we're not going to fund them. No, the statutory system here gives the director discretion to manage the overall system. It then directs him to develop, in Idaho Code 56-118, it directs him to establish a reimbursement rate methodology. And it's that methodology that the feds approved. That's correct. Okay. And he did that. He followed that methodology. He created the methodology, but he didn't implement the methodology. I thought he actually raised the rates, but the legislature wouldn't fund it. Your Honor, the rates that are actually paid to my clients are set out in a pricing file maintained by Mr. Armstrong. The pricing file was never changed. And so they continued to receive rates that were established on an unknown basis in the record back in 2006. And so from 2006 through 2009, the rates remained the same, and they remained unexplained, at least in the record we have. In 2009, the new rate was published, the methodology was created, and to great fanfare, Mr. Armstrong said this is the result of what the legislature told us to do. But that never became part of the regulatory scheme in Idaho. Well, you say part of the regulatory scheme, and what regulation are you talking about? A pricing file. A pricing file is not a regulation, is it? I mean, a pricing file is a file in the director's office cabinet. In the Idaho Administrative Code, Section 16.03.09.230. Slow down. 16.09. I'm sorry, 16.03. 03. .09. .09. .230. .230. Says that Medicaid providers will be reimbursed no more than the regular rate for that service, or the price maintained in the director's pricing file. That's the general Medicaid plan regulation. Almost that exact same language is repeated in Section 16.03.10.36, and then again in 16.03.10.706, which is specific to the waiver services, and this is a waiver service. Right. So we drill down through the layers of regulations, and what Director Armstrong has done repeatedly is he has said, we will not pay you more than whatever number is listed in our pricing file. We brought an as-applied challenge under the Supremacy Clause. Now, it is quite fine, facially, for the director to say, we're going to maintain a pricing file and we're going to pay you by the pricing file. We couldn't bring a facial challenge to that. Under Salerno, there are certainly circumstances where that would be permissible. As applied, in this case, where the pricing file price is indeed below any price that the department would develop while applying the statutory factors. As applied in that circumstance, he's preempted. But doesn't this really come down to the director refuses to raise the price? It's more than that. If it was just the director refuses to raise the price, that would be a different case. What we have here is the director has said he should raise the price. Right. CMS has approved the director's methodology. Yes. But the methodology hasn't resulted in a price change. Everyone agrees. He can't raise the price because there's no extra money and the legislature hasn't appropriated or authorized him to do so. As Mr. Withrow just explained, the legislature provides a certain amount of funding for a certain array of services. Mr. Armstrong is free within that section of the budget to put the money where he wants. But doesn't he have to take it away from other Medicaid providers? And Mr. Armstrong has a wide variety of ways to meet his budget goals. There are mandatory services and discretionary services. But if he's robbing Peter to pay Paul, and I'm trying to figure out in doing that, why isn't he then causing the same problem someplace else under 30A? Because what 30A says is you'll set up the reimbursement rates on these factors. It doesn't say you have to provide all of the services. Let me ask you a different question. This is your next case, and your next case is the other providers who now have had money taken away that they believe they're entitled to be paid at higher rates come to you, and you're going to bring the same claim, are you not? Your Honor, what the department ‑‑ this case has been resolved already, actually. In my original complaint ‑‑ Well, it's been resolved because the legislature appropriated more money. In my original complaint, Your Honor, I alleged two different problems. One was this one that we're here on. The other was that the department cut services for a service called DDA services. And they said, okay, you used to get 30 hours a week of the service. We're going to reduce you to 22 hours a week. That case got ‑‑ that part of the case got dismissed. Because the ‑‑ and I also don't remember whether I dismissed it voluntarily or whether Judge Wendell dismissed it, because DDA services were a voluntary service. And the attorney general correctly pointed out, we're free to cut those services. And, in fact, if you raise these rates, we may have to cut services. So is that how they paid for the increased rates? Not directly. It wasn't. But it was how they made budget savings. I mean, it wasn't they said, oh, we're going to have to raise these rates, so we're cutting those services. But facing a budget shortfall, the director said, we have other ways to save money, and we're going to use some of those. We're going to reduce this particular service to save money. They recently eliminated a service entirely, a residential habilitation service in a different setting entirely, and then gave it to a selective contractor to save money. Mr. Armstrong has ways to save money in his program. What federal law preempts is doing so by setting arbitrary reimbursement rates that are based purely on budget and not on the statutory factors. Well, would you agree that, okay, let's assume everything you say is true and look at the entire record in the light most favorable to you. Wouldn't you agree that the manner in which state law is preempted is when state law or regulation is imposed to do those things? But none of that happened here. I believe, really, your very best case is that the director did not comply or do what he was supposed to do under 30A, but he couldn't. And in addition to that, you have this problem that the actions of a state department official or inactions don't constitute a claim which would be preempted. I think that's your biggest problem here. The Supremacy Clause speaks in terms of federal law displacing any state or local law. Right. So the question becomes, what is law in that setting? Right. This Court and the other circuits have addressed that. They have found certainly statutes, local ordinances, administrative regulations. Even in Doe v. Rampton, 497 Federal 2nd, 1032, the Tenth Circuit found preempted a field manual issued by the, I think it was Colorado, maybe Utah Department of Health and Welfare, a field manual governing eligibility determinations for, I want to say in that case it was AFDC, Aid to Families with Dependent Children. They found the field manual was a law subject to preemption. Here we're asserting that the pricing list and the regulation which gives Mr. Armstrong unbridled discretion to set that pricing list however he wants without paying any attention to the federal statutory factors, that those are preempted. Okay. So let me get you straight. You say that what says anything in a constitution or law textually, of course the founders never thought about Medicaid, let me put that to one side, but that anything means, in your case, not a statute, not a regulation, but a pricing list which the director can formulate. That's right. That rises to the level of law, of state law in this instance. Pricing is the law under Article VI, right? Yes. Okay. That's our position. Now, do we have any authority at all for that? The closest I can come to that. The second question is, handle Hawkins, would you please? Yes. Hawkins, well, the closest I can come is the fact that this circuit has in many cases recognized that administrative regulations, at least down to that level, constitute law. No question about it. We've got the Rampton case in the Tenth Circuit which says a field manual. All right. You talked about that. That. That's as close as you can get. And then we've got other cases saying the common law. A common law negligence claim is law sufficient to invoke Article VI. That's the Honda claim in the District of Columbia. I've got that. Right. No, but that's what I've got. Our argument, though, is that in this case where the pricing list is specifically mentioned in the regulation, the state regulation, this is more than just, as was the case in Hawkins, where somebody undertook an act which may or may not violate federal law. That situation is one that if a Section 1983 action is available, is what 1983 was meant to address. We admit no 1983 action is available here. The, but that was that case. That's a potential case. How is Hawkins different because there was no pricing list in Hawkins? There was no pricing list. There was, the best analogy I can come up with is from the 1983 context, the Monell line of cases, where there has to be more than simply an act. There has to be a pattern of practice, a standard procedure, something of that nature. Where we've got that, we have law that can be preempted. Where we don't have that, all we have is the actions of an individual who happens to be clothed with the indicia of state authority. But once we have something beyond that, once we have that pattern of practice policy, then we have law that can be preempted by federal law. So you analogize the actions of the director in failing to change the pricing list, which is a determinant of what is paid, to agency action in formulating a regulation. We don't simply call it, yes, but we don't simply call it inaction. There was action. He adopted a price. We say that price is not lawful because it conflicts with federal law. Okay. The, where that leaves the court then is what exactly does Section 30A mean in the post-managed pharmacy care setting, since that is now the law of this circuit? Managed pharmacy care says we're not going to impose a particular procedural setting under 30A. The cost studies portion of Belshi is overruled, but not the other portion, which says that the price reimbursement rate setting can't be purely budgetary. We'd ask the court to look at the stipulated facts here and find, as the district court did, that the reimbursement rate currently being used is purely budgetary. There's nothing in the record to indicate that there's any basis for it, and, in fact, the director admits, if I only had the money, I'd increase it. And managed pharmacy, is it your position, eliminates orthopedic requirement that there be a consideration of cost? In the setting where CMS has approved a system, managed pharmacy is based on deference to CMS, and CMS in that case said you don't have to consider costs. CMS in this case has said you do have to consider costs, because that was the waiver that Mr. Armstrong had approved. So we have to try to find a way to understand managed pharmacy in light of the totally different factual setting here, where CMS has said to the state of Idaho, you must consider costs, because that's what you said you would do, but they haven't done so. In that setting, what we're left with is a purely budgetary setting, which either the court should affirm or, at the very least, should remand to determine whether there's a basis for the 2006 rate that is other than budgetary in nature. Well, if I look at the language of 30A, though, I'm still troubled by the fact that it requires that whatever the payments are, that they be consistent with efficiency, economy, and quality of care, sufficient to enlist enough providers so that care and services are available under the plan. And as I understand the record, those services are still available, even though the providers are not being paid at a rate that they would prefer. So how is 30A being violated? Two responses there, Your Honor. The first is that in this Court's decision, well, in the decision of every circuit that has addressed the matter, they've looked at 30A, and even those circuits that have adopted the outlook that says 30A only says we need to get a result, which seems to be the law of this circuit post-managed pharmacy. What they have also said every single time is, but that doesn't mean the rate setting can simply be arbitrary. That doesn't mean it can be purely budgetary. And, for instance, the Third Circuit recently in a case, let me see if I can find it here, it's Christ the King Manor. Those two things are inconsistent. If all we're concerned with is the result, as Judge Tallman has read to you, that the services be available, it doesn't matter what the input is. But that's what the other circuits have said is, yes, you have to have a result, but as you're setting those rates, you have to be looking to the result. You can't be looking somewhere else to set your rate. You have to be looking to how does my rate relate to achieving the result. Otherwise, the state hasn't considered the statutory factors at all. There are no statutory factors that they have to consider costs. That's not in the statute. You're right. So if the only question is, is the result adequate, one doesn't care about what the inputs and methods of getting there is. Which I guess the answer then, Your Honor, is that the other circuits that have looked at it don't really say it's only the results that matter. They say it's only the results that matter. But then they say, but you can't just set a budgetary rate. And every court to look at this has said that. It can't be purely budgetary. I guess the problem I'm struggling with is I don't see a 30A violation here. Now, there may be a violation of whatever the methodology was that CMS approved if the state isn't following it. But that's got to be found somewhere else besides 30A, does it not? 30A requires that rates be set so as to achieve the result. Right. And the results are, as I read in the statute, twofold. Don't produce unnecessary utilization, which I read to mean don't make the rates so high that there will be an incentive to over-prescribe the services. And then secondly, the portion that I read to you about making sure that there will services, adequate services will be available to take care of the Medicaid population. The other way to look at this is the way that it was looked at in the cases that led to Douglas, which, of course, are vacated now. But there was support from other circuits in those cases. What this court said in those cases was it's not enough that the result happens. In that case, for instance, in Shuri, the independent living center versus Shuri, Shuri argued, hey, wait a minute. The hospitals are still treating people. They still have to treat people. They're not allowed to close their emergency rooms. And this court said there, that's not enough. It's not enough that some separate source of law results in compliance. The Medicaid system has to result in compliance, and that's what's happening here, is outside factors are resulting in compliance. My clients aren't willing to turn away developmentally disabled poor adults. They'll go bankrupt before they'll turn them away. But that's not how Medicaid was meant to be designed. That's not what Congress intended when it passed 30A. What it intended was that the rates as part of an overall system would result in that result, not that the goodness of human hearts would achieve that result. And that's what's happening today, is the owners of these companies will pay $8 an hour and will make every other sacrifice necessary to be able to provide service. Okay. Thank you. Let's have the last word from the State. I'll give you a couple minutes. Thank you, Your Honor. Just a couple of points. What we heard today from Mr. Piotrowski and what we read in his brief concerns an awful lot about the State's compliance with Idaho Code 56-118, which is the Medicaid payment statute, and about compliance with the 2009 waiver amendment. Now, there's a couple points on that. The case in the district court was nothing at all about those two things. There was no factual development on those issues. There was no argument on those issues. The stipulation of facts does not concern whether those things were complied with. So there are no facts to support the claims that the Department is not complying with the methodology in the 2009 waiver amendment. The other point there is the 2009 waiver amendment isn't anywhere in the record. So what it says, what it means, is not in front of this Court properly. Thank you. The other point is that they say that the rates were not set on the methodology in the 2009 waiver, but the waiver amendment reflected simply the statutory directive to include certain cost data in the Department of Health and Welfare's reports to the legislature. It did not do what the plaintiffs think that it did. And, again, that kind of demonstrates why resolution of this case on the State's compliance or noncompliance with the 2009 waiver is inappropriate. No facts, no argument, nothing in the record to support those claims. So it's your point that even though the cost studies have been done in 2009 and the results reported to the Director, the Director is not under an obligation to raise the rates, even though the cost studies suggest that the amounts that are being reimbursed are too low? The two points on that, yes. First, the statute 56-118 makes clear that this reporting of this cost data will not necessarily lead to a change in rates, up or down. All the legislature wanted from my read of the statute is, Department of Health and Welfare, when you present your information to us, these are the things that we want you to consider. And so there's another point in the brief where the plaintiffs say that the CMS approved what the district court ordered. Again, that is absolutely not true, and they point to the waiver, 2009 waiver amendment for that proposition, but, again, without the waiver. Let's litigate the waiver. That's a whole different thing, but I don't think that at this stage of the game they should not be permitted to go back and amend. And one last point. No. That's all I have. Thank you. All right. Well, thank you both. We'll puzzle our way through and get you an answer as soon as we can. The case just argued is submitted for decision. We stand in recess until tomorrow morning. Thank you.
judges: Murphy, Tallman, Bea